Filed 3/29/16  P. v. Benitez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAMON BENITO BENITEZ,<br><br>    Defendant and Appellant. | D065747<br><br><br><br>(Super. Ct. No. SCD242443) |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth K. So, Judge.  Affirmed.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Ramon Benito Benitez of lewd acts on a child under the age of 14, in violation of Penal Code,[1] section 288, subdivision (a). The jury found substantial sexual contact under section 1203.066, subdivision (a)(8), as to four of the seven counts, and the court sentenced Benitez to a term of 18 years. Benitez appeals the judgment of conviction on two grounds. First, he argues the trial court erroneously admitted statements he made to the police because his advisements under *Miranda v. Arizona* (1966) 384 U.S. 436, 469 (*Miranda*) were defective. Benitez also argues he suffered ineffective assistance of counsel because his attorney did not successfully admit evidence of the victim's prior sexual conduct. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Benitez was the stepfather of the victim, minor Wendy V., and had been in her life since she was two years old. Wendy lived with Benitez, her mother, Maria V.,[2] and her three half siblings.

In March 2012, Wendy told her middle school guidance counselor, Gloria A., that Benitez had touched her breasts on multiple occasions. Gloria A. contacted the San Diego County Health and Human Services Agency, Child Welfare Services (CWS), and police became involved.

---

[1]     Further statutory references are to the Penal Code, unless otherwise specified.

[2]     To protect the victim's confidentiality, we omit the mother's last name.

CWS social worker Juanita Aguayo interviewed Wendy at school; Wendy told Aguayo that Benitez had touched her more than once. Aguayo interviewed Benitez, who denied the allegations. She then transferred the case to social worker Patricia Alvarenga.

Alvarenga interviewed Benitez, who denied the allegations. She kept an open-door policy, however, and Benitez later came to Alvarenga's office. He stated he knew he had done something wrong. Benitez admitted touching Wendy's breasts on three separate occasions after Wendy had asked him about her stretch marks. He stated he touched Wendy's vagina once by accident when tickling her and had "jokingly" told Wendy not to report the incident.

In June 2012, Wendy met with Marisol Olguin, a forensic interviewer for the Rady Children's Hospital. Wendy told Olguin that Benitez had touched and tried to lick her breasts on several occasions. She was young the first time he touched her vagina. Benitez came home drunk, pushed his hand under Wendy's undergarments, and inserted his finger in her vagina. Wendy recalled Benitez masturbating in front of her and preventing her from leaving the room. Benitez would ask her to lick his penis and masturbate him, but she had never done so. Wendy described an incident in Tijuana, Mexico, in which she and Benitez were alone in a hotel room waiting for someone. Benitez tried to take off her clothes and have sex with her, but Wendy started crying, and Benitez masturbated in front of her instead.

Benitez spoke to police detectives in August 2012. Detective Donna Eastep read Benitez his *Miranda* rights in Spanish, but she misstated the word "guardar" (meaning "to remain") as "jugar" (meaning "to play"). As a result, Benitez was advised, in relevant

3

part: "You have the right to *play* silent. If you give up the right to play silent, anything you say, can, and will be used in court against you." (Italics added.) Detective Eastep asked Benitez if he understood his rights as read. Benitez answered in the affirmative and proceeded to speak with the detectives. He denied ever touching Wendy sexually but admitted having touched the sides of her breasts on two occasions when she asked him about her stretch marks. He also admitted touching Wendy's vagina once by accident, while playing. Benitez told detectives Wendy had twice walked in on him masturbating. He admitted taking Wendy to a hotel room in Tijuana to wait for someone but denied anything sexual occurred.

Benitez was charged with seven counts of lewd acts on a child under the age of 14. (§ 288, subd. (a).) The People alleged Benitez touched Wendy's breasts and vagina, both over and under her clothing, between 2005 and 2012. Four of the counts alleged substantial sexual contact. (§ 1203.066, subd. (a)(8).) Prior to trial, the court granted the People's motion to exclude evidence relating to Wendy's prior sexual conduct with her cousin and denied Benitez's motion to exclude his August 2012 statement to police. These evidentiary rulings are central to Benitez's appeal.

At trial, Wendy testified that Benitez had been molesting her since she was in elementary school. She described him touching her vagina once when she was sleeping with her siblings; rubbing her vagina over her clothes when they sat on the couch; reaching into her shirt to fondle her breasts during a car ride from Tijuana to San Diego; masturbating in front of her on multiple occasions without allowing her to leave; and pinning her down and pulling off her leggings and underwear. Wendy testified about the

4

incident in a Tijuana hotel room. She recounted that Benitez undressed and tried to take off her jeans to have sex with her; when she started crying, Benitez masturbated in front of her instead. Benitez had told Wendy before that incident that he wanted to have sex with her. Wendy testified that Benitez threatened her not to report him. On cross-examination, Wendy admitted having asked Benitez about stretch marks near her breasts when her body was changing but denied ever showing the marks to him. She admitted having walked in on Benitez once by accident when he was masturbating but distinguished this incident from the times Benitez purposefully masturbated in front of her.

Gloria A., Wendy's friend Rose M., and Aguayo testified that Wendy appeared afraid, nervous, and shaky the day she reported the molestation. The jury watched a recording of Olguin's June 2012 forensic interview of Wendy, in which Wendy recalled incidents in greater detail. Olguin testified it was not unusual for a child to recall sexual molestation in greater detail during a one-on-one forensic interview as compared to later during trial. The prosecution's expert witness, Catherine McClennan, testified about behaviors and coping mechanisms of child sexual molestation victims; she explained it was not uncommon for victims to focus attention elsewhere during abuse and lose memories of specific instances as time passed. The People also examined Alvarenga and Detective Eastep, who testified about Benitez's admissions.

The defense case largely focused on Wendy's inability to remember specific instances of touching during trial. The defense examined clinical and forensic

psychologist Bruce Yanofsky, who testified Benitez lacked the psychosocial orientation or interests of a person who would have committed a lewd act on a child.

The jury convicted Benitez on all seven counts and found that four of the counts involved substantial sexual conduct. (§§ 288, subd. (a), 1203.066, subd. (a)(8).) The court sentenced Benitez to a total term of 18 years.

## DISCUSSION

On appeal, Benitez argues the trial court erred in admitting statements he made to police in August 2012 because Detective Eastep's advisement that he had the right to "play silent" did not adequately convey his *Miranda* right to *remain* silent. (*Miranda, supra,* 384 U.S. at p. 469.) Benitez also argues he suffered ineffective assistance of counsel as a result of his attorney's failure to admit evidence of Wendy's prior sexual conduct with her cousin. We conclude the trial court correctly found that under the totality of the circumstances surrounding the interrogation, Benitez was aware of his right to remain silent; moreover, any *Miranda* error was harmless beyond a reasonable doubt. We also reject Benitez's ineffective assistance of counsel challenge because Benitez does not meet his burden to show prejudice from his attorney's failure to successfully introduce evidence of Wendy's prior sexual conduct.

### I. *Admission of Benitez's Statement to Police*

Benitez argues the judgment of conviction should be reversed because the trial court admitted statements he made to police in August 2012. He argues he received defective *Miranda* warnings before speaking with police. Benitez is a native Spanish speaker, and Detective Eastep delivered the *Miranda* advisements in Spanish. The

6

parties do not dispute that in advising Benitez of his *Miranda* rights, Detective Eastep used the word "jugar" (to play) instead of "guardar" (to remain), with the result that Benitez was told he had the right to *play* silent and that if he gave up the right to *play* silent, anything he said could and would be used against him in court. The trial court denied Benitez's motion to exclude his statement to police, finding that under the totality of circumstances, Benitez "was aware of his right to remain silent," and the concept had been "reasonably conveyed." As we explain, Benitez's *Miranda* warnings were not rendered constitutionally defective by Detective Eastep's misstatement of one Spanish word; under the totality of the circumstances, Benitez was aware of his right to remain silent.

In 1966, the United States Supreme Court held that when an individual has been taken into custody for questioning, certain procedural safeguards are required to protect a defendant's Fifth Amendment privilege against self-incrimination. (*Miranda, supra,* 384 U.S. at p. 469.) Specifically, a detainee "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Id.* at p. 479.) Unless the defendant "knowingly and intelligently waive[s] these rights and agree[s] to answer questions or make a statement," "no evidence obtained as a result of interrogation can be used against him." (*Ibid.*) California courts apply federal standards in reviewing a defendant's claim that his statements were elicited in violation of *Miranda*. (*People v. Cunningham* (2001) 25 Cal.4th 926, 993 (*Cunningham*).) Because the facts

7

are not in dispute, we independently review whether Benitez's statement to police was voluntary under *Miranda*. (*Cunningham*, at p. 992.)

A detainee must be apprised of his right to remain silent: "such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere" and overcoming the sense "that the interrogation will continue until a confession is obtained or that silence in the face of accusation is itself damning." (*Miranda, supra,* 384 U.S. at p. 468.) "The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of foregoing it." (*Id.* at p. 469.)

On review, courts assess whether, under the " 'totality of circumstances' " surrounding the interrogation, a defendant in custody knowingly and voluntarily waived his or her *Miranda* rights in making statements to the police. (*Moran v. Burbine* (1986) 475 U.S. 412, 421; *People v. Whitson* (1998) 17 Cal.4th 229, 246, 248-249.) Critically, "the *Miranda* warnings are 'prophylactic' [citation] and need not be presented in any particular formulation or 'talismanic incantation.' " (*People v. Walsh* (1993) 6 Cal.4th 215, 236.) "The essential inquiry is simply whether the warnings reasonably ' "[c]onvey to [a suspect] his rights as required by *Miranda*." ' " (*Id.* at pp. 236-237; see *Duckworth v. Egan* (1989) 492 U.S. 195, 203 [same].)

Applying these principles, Detective Eastep's *Miranda* warnings were not constitutionally defective as a result of her misuse of the word "play" instead of "remain." When viewed in the "totality of circumstances," telling Benitez he had the right to play

8

silent and that anything he said could be used against him in court reasonably conveyed to Benitez the substance of his right to remain silent.  (See *United States v. Hernandez* (10th Cir. 1996) 93 F.3d 1493, 1502 ["It is true that [the police interpreter's] translation was imperfect.  However, warnings that convey the substance of the suspect's rights are sufficient."]; *People v. Mayfield* (1993) 5 Cal.4th 142, 172 [rejecting defendant's argument that *Miranda* waiver was invalid because of detective's use of the first person rather than the second in reading defendant's rights because "it was obvious whose waiver was being sought"].)  Benitez stated he understood his *Miranda* rights as advised, which supports his knowing and voluntary waiver of his right to remain silent.  (*People v. Marquez* (1992) 1 Cal.4th 553, 570 [although *Miranda* warnings read in Spanish contained a few words that may have been confusing, trial court properly concluded waiver was knowing and voluntary where detective read defendant's rights in Spanish, asked the defendant in Spanish if he understood, and defendant replied in the affirmative].)

Benitez cites *People v. Diaz* (1983) 140 Cal.App.3d 813 (*Diaz*), but that case is distinguishable.  In *Diaz*, detectives' use of the Spanish word "conseguir" conveyed to detainees that if they could not *get* a lawyer, one would be named before questioning. (*Id.* at p. 822.)  The court concluded the warning failed to convey the right of *indigents* to

appointed counsel if they could not *afford* an attorney. (*Id.* at p. 823.)[3] Here, unlike in

*Diaz*, the misuse of one Spanish word did not change the *substance* of the right conveyed.

Telling Benitez he had the right to *play* silent and that if he gave up that right, anything

he said could and would be used against him reasonably conveyed to Benitez the

substance of his Fifth Amendment right to remain silent and the consequences of giving

up that right. (*Miranda, supra,* 384 U.S. at p. 469.) Courts have declined to find waiver

effective where *Miranda* warnings given in Spanish created a substantial risk of

confusion or failed to reasonably convey the substance of a particular right. (*United*

*States v. Botello-Rosales* (9th Cir. 2013) 728 F.3d 865, 867; *United States v. Perez-Lopez*

(9th Cir. 2003) 348 F.3d 839, 848-849.) There is no such risk here. Benitez was

informed of the *consequences* of giving up his right to "play silent"—that anything he

said could and would be used in court against him—and thereafter knowingly and

voluntarily chose to speak with police.[4]

Even were we to assume that Benitez's statement was obtained in violation of

*Miranda*, we conclude its admission in this case was harmless beyond a reasonable

doubt. (*Cunningham, supra,* 25 Cal.4th at p. 994 [applying harmless error standard to

alleged *Miranda* violation]; *Chapman v. California* (1967) 386 U.S. 18, 24 ["before a

---

3    Moreover, in *Diaz*, the defendant replied "no" when asked if he understood his
rights in a taped interview immediately following his statements to police. (*People v.
Diaz, supra,* 140 Cal.App.3d at p. 820.) By contrast, Benitez answered "yes" when asked
if, understanding his rights, he was willing to speak with police.

4    Because we conclude that *Miranda* waiver was knowing and voluntary, we need
not address the People's argument that Benitez was not in actual or constructive custody
at the time of his questioning.

10

federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].) " 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " (*Chapman*, at p. 23.)

There is no reasonable probability that Benitez's statements to police contributed to his conviction. Benitez made almost identical statements to social worker Alvarenga, who testified at trial. He told both police and Alvarenga he had touched Wendy's breasts to check for stretch marks—he told police he had done so twice and Alvarenga three times. He told both police and Alvarenga he touched Wendy's vagina over her clothes by accident while they were playing. The only additional information Benitez provided to police, but not to Alvarenga, was that Wendy walked in on him masturbating on two occasions and that he took Wendy to a hotel room in Tijuana (where he denied anything sexual occurred). This information was produced at trial independent of the police statement. Wendy testified having walked in on Benitez masturbating by accident, but she distinguished the incident from instances where Benitez forced her to watch him masturbate. Wendy also testified about the incident in Tijuana, and the jury watched her taped interview with forensic interviewer Olguin in which she described what occurred.

Critically, the jury heard firsthand testimony from Wendy that Benitez had touched her breasts and vagina on multiple occasions since she was in elementary school. Testimony by Wendy's friend Rose, school counselor Aycos, social workers Aguayo and Alvarenga, and forensic interviewer Olguin, corroborated Wendy's testimony and supported her credibility. As in *Cunningham*, the "jury was able to consider the same

11

evidence in far greater detail through the testimony of several other witnesses," and the statements Benitez made to the police "did not contribute to [his] conviction in light of the entire record." (*Cunningham, supra,* 25 Cal.4th at p. 994.)[5]

II. *Failure to Admit Evidence Regarding Wendy's Prior Sexual Conduct*

Benitez argues he suffered ineffective assistance of counsel because his counsel did not raise several relevancy grounds for admitting Wendy's 2010 sexual contact with her cousin, Giovanni, and did not file a motion under Evidence Code section 782 to admit this evidence as bearing on Wendy's credibility. As we explain, Benitez's ineffective assistance of counsel claim is not persuasive because he does not meet his burden to show prejudice from his counsel's alleged shortcomings.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington*

---

[5] Benitez argues Wendy made inconsistent statements about the *purpose* for their trip to Tijuana and that her testimony would have lacked credibility absent his statement to police corroborating their trip to Tijuana (without reference to its purpose). Wendy told Olguin she and Benitez went to Tijuana to buy piñatas for her cousin's baptism; at trial, however, Wendy testified the hotel room incident occurred during a different trip to Tijuana. Benitez's argument that the jury *may* have questioned Wendy's credibility about the uncharged Tijuana incident based on her inconsistent recollection as to the *purpose* for that trip is speculative and does not support a " 'reasonable possibility' " that the police statement corroborating the Tijuana trip (without reference to its purpose) contributed to the conviction. (*Chapman, supra,* 386 U.S. at p. 23.) Indeed, Wendy testified that her memory was fresher during the interview with Olguin. McClennan testified it is not unusual for child sexual molestation victims to forget or block out details, and inconsistencies about peripheral facts do not automatically raise red flags. Olguin likewise testified child molestation victims have a tendency to blend incidents together when the same act occurs repeatedly over a certain period of time.

(1984) 466 U.S. 668, 686.) "In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Williams* (1997) 16 Cal.4th 153, 214 (*Williams*).) "If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.) A defendant must also "show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Williams,* at p. 215.) "If there is no showing of prejudice, we need not examine counsel's performance." (*People v. Mestas* (2013) 217 Cal.App.4th 1509, 1518 (*Mestas*).)

Evidence of a sexual molestation victim's prior sexual conduct is only admissible under narrow circumstances. Limitations on admissibility reflect the Legislature's "valid determination that victims of sex-related offenses deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy." (*People v. Fontana* (2010)

13

49 Cal.4th 351, 362 (*Fontana*).)[6] Evidence of a victim's prior sexual conduct may be admissible when offered to attack the victim's credibility, "provided that its probative value outweighs the danger of undue prejudice and the defendant otherwise complies with the procedures set forth in Evidence Code section 782." (*Fontana, supra*, 49 Cal.4th at p. 354.)[7] Thus, even if Benitez's counsel filed a motion and sought an evidentiary hearing, evidence of Wendy's prior sexual conduct would need to satisfy the admissibility requirements of Evidence Code section 352. (*Fontana*, at p. 354; Evid. Code, § 782, subd. (a)(4).) Evidence Code section 352 allows a court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

---

6    Benitez argues that evidence regarding the 2010 incident with Giovanni would not have been unduly prejudicial because Wendy was 11 at the time of the incident and her cousin was the aggressor. Benitez misstates the standard. Irrespective of whether Wendy or Giovanni was the aggressor, limitations on admissibility reflect legislative intent to protect sexual violence victims against "unnecessary invasions of privacy." (*Fontana, supra,* 49 Cal.4th at p. 362.)

7    Pursuant to Evidence Code section 782, a defendant seeking to introduce evidence of the witness's prior sexual conduct must file a written motion containing an offer of proof detailing the relevance of the proffered evidence to the victim's credibility. (*Fontana, supra,* 49 Cal.4th at p. 354; Evid. Code, § 782, subd. (a)(1) & (2).) If the offer of proof is sufficient, the court must order a hearing outside the jury's presence to allow questioning of the witness regarding the offer of proof. (Evid. Code, § 782, subd. (a)(3); *Fontana, supra,* at p. 354.) "If the court finds the evidence relevant under section 780 and admissible under section 352, the court may make an order stating what evidence may be introduced by the defendant and what questions are permitted." (*Fontana, supra,* at p. 354; see Evid. Code, § 782, subd. (a)(4).)

14

During the preliminary hearing, Wendy testified that in 2010, her cousin Giovanni came to her house, pulled down her leggings, and had sexual intercourse with her against her will. Benitez was outside the house when this happened; when he returned, he was concerned that Wendy and Giovanni were in a locked bedroom. When Maria came home, Benitez told her what happened, and the two spoke to Wendy. The next day, Maria and Benitez reported the incident to the police. Wendy spoke to the police and a social worker but did not mention Benitez's touching at that time. Wendy testified that Giovanni had made her touch and masturbate his penis on other occasions. Giovanni had also touched her breasts and vagina, but he had never inserted his fingers in her vagina.

The People moved to exclude this evidence at trial. Benitez's counsel objected, arguing it could bear on Wendy's credibility. Benitez's counsel suggested Maria and Benitez may have restricted Wendy more after the incident, causing a rift and leading Wendy to fabricate the allegations against Benitez. The court asked whether Benitez's counsel wanted to make an offer of proof; he declined, stating he had not had a chance to speak with Wendy and could only suggest that there might be several ways in which the evidence could become relevant. The court noted Benitez could elicit testimony from Wendy at trial as to whether she was reacting to any restrictions at home. Questioning the relevance of Wendy's 2010 sexual contact with Giovanni, the court granted the People's motion to exclude the evidence.

On appeal, Benitez contends evidence of Wendy's prior sexual history with Giovanni was admissible to challenge Wendy's credibility. Benitez contends this evidence bears on Wendy's credibility in several ways. We conclude the probative value

15

of the proffered evidence is limited, and the evidence would have been excluded under Evidence Code section 352, irrespective of whether Benitez's counsel filed a motion under Evidence Code section 782. (Evid. Code, §§ 782, subd. (a)(4), 352.) Where, as here, evidence of a child molestation victim's prior sexual contact is more prejudicial than probative of the victim's credibility, the evidence is properly excluded at trial. (*People v. Woodward* (2004) 116 Cal.App.4th 821, 832 (*Woodward*); *Mestas, supra,* 217 Cal.App.4th at p. 1518.)

First, Benitez argues the evidence may have called into question the source of Wendy's knowledge about the appearance of an erect penis and ejaculation. Benitez cites *People v. Daggett* (1990) 225 Cal.App.3d 751 (*Daggett*), for the proposition that evidence of a child molestation victim's prior sexual conduct is relevant "to cast doubt upon the conclusion that the child must have learned of these acts through the defendant" as opposed to through another perpetrator. (*Id.* at p. 757.) Benitez contends evidence of Wendy's prior sexual conduct with Giovanni was relevant to cast doubt on whether she learned what an erect penis and ejaculation looked like through Giovanni's acts, as opposed to Benitez's acts.

However, unlike *Daggett*, which involved molestation of a young child, there was no dispute that high-school aged Wendy knew how a penis looked. (Cf. *Daggett, supra,* 225 Cal.App.3d at p. 757 [knowledge of sexual acts "may be unexpected in a child who had not been subjected to them"].) Defense counsel elicited testimony from Wendy that she had walked in on Benitez masturbating, and Wendy testified at the preliminary hearing that she had taken a sex education class in eighth grade. Moreover, *Daggett*

16

limited its ruling to cases where "the acts involved in the prior molestation are similar to the acts of which the defendant stands accused." (*Daggett*, at p. 757.) Here, neither Giovanni's masturbation in front of Wendy nor his forcing her to have intercourse has any bearing on the conduct Benitez was charged with—touching Wendy's breasts and vagina, including through digital penetration, over an extended period of time. Evidence regarding Giovanni's sexual acts in 2010 would invite a trial within a trial on a collateral issue and therefore would be inadmissible under Evidence Code section 352. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457 (*Tidwell*) [§ 352 does not allow " 'an unlimited inquiry . . . into collateral matters' "; " 'proffered evidence must be of some competent, substantial and significant value' "];[8] *Woodward*, *supra*, 116 Cal.App.4th at p. 832 [child molestation victim's prior sexual contacts were "dissimilar to the charged crimes" and properly excluded under Evid. Code, § 352]; *Mestas, supra,* 217 Cal.App.4th at p. 1518 ["Even if the trial court found the allegation (that child molestation victim had masturbated when she was five years old) true after a hearing, the evidence would have been excluded under Evidence Code section 352 because it had very little probative value with respect to [victim's] credibility."]; *People v. Franklin* (1994) 25 Cal.App.4th 328, 335 [child sex abuse victim's prior sexual conduct, in seeing brothers naked, had

---

8    Benitez cites *Tidwell* for the proposition that a defendant does not need to comply with the procedures set forth in Evidence Code section 782 when a victim's prior sexual conduct is offered for impeachment. (*Tidwell, supra,* 163 Cal.App.4th at pp. 1447, 1456.) Although *Tidwell* concluded Evidence Code section 782 was not applicable where the defendant sought to introduce a victim's past false complaints of rape, the court nevertheless excluded this evidence under section 352 of the Evidence Code "because the evidence was weak on the issue of [the victim's] credibility and would require an undue consumption of time." (*Tidwell*, at p. 1457.)

limited probative value on whether source of victim's knowledge of sexual matters was someone other than defendant].)

Next, Benitez contends Wendy's failure to report Benitez's molestation when she reported the 2010 incident and her failure to report Giovanni's molestation when she reported Benitez in 2012 call her credibility into question. Benitez likewise contends his *reaction* to the 2010 incident, encouraging Wendy to report the incident to police and thereby opening himself up to the risk of being reported, calls into question Wendy's credibility.

The probative value of the 2010 incident under each of these proffered theories is minimal. Wendy testified that Benitez threatened her to not report his molestation; she told Olguin she had been afraid to report the abuse. During the preliminary hearing, Wendy explained that she did not report Benitez's conduct in 2010 because she was afraid. Benitez admitted to Alvarenga that he "jokingly" told Wendy not to report his touching of her vagina. Given Benitez's threats, Wendy's failure to report Benitez in 2010 and Benitez's encouragement for her to report Giovanni at that time have limited probative value as to Wendy's credibility. Benitez's argument that the jury would have discounted Wendy's credibility based on his reaction to the 2010 incident is mere speculation.

Likewise, Wendy's failure to mention the 2010 incident when Olguin asked "has anybody else ever done what your [stepdad] did" or "has anybody else ever done anything to you that you didn't want them to do" has little probative value. Olguin testified it is not unusual for child molestation victims to fail to recall specific instances

18

of abuse in response to general questions. It is speculative to suppose a jury may have disbelieved Wendy's testimony about Benitez touching her breasts and vagina because she did not respond to Olguin's general question by revealing Giovanni had *also* molested her. In contrast to its limited probative value, evidence of the 2010 incident presents substantial danger of unnecessary invasion of minor Wendy's privacy, a harm the Legislature sought to avoid in limiting the admissibility of prior sexual conduct evidence. (*Fontana, supra,* 49 Cal.4th at pp. 362-363, 370.) The evidence is therefore inadmissible under Evidence Code section 352.

Indeed, the trial court considered and rejected, on relevance grounds, nearly all the evidence Benitez seeks to introduce. During the preliminary hearing, Wendy testified about her failure to report Benitez to the police or social worker in reporting the 2010 incident; her failure to report the 2010 incident to the social worker in reporting Benitez in this case; Giovanni's masturbation and sexual acts; and Benitez's concern for Wendy after the incident. In granting the People's motion to exclude at trial, the trial court considered Wendy's testimony as a whole and appropriately determined that evidence of Wendy's prior sexual conduct with Giovanni was not relevant.[9] The failure to conduct an evidentiary hearing under Evidence Code section 782 was harmless because the same evidence was elicited during the preliminary hearing and determined inadmissible on relevance grounds. (See *Fontana, supra,* 49 Cal.4th at p. 367 [failure to conduct hearing

---

[9] Benitez does not challenge the trial court's ruling excluding evidence regarding Wendy's prior sexual contact with Giovanni on relevance grounds. "A trial court's ruling on the admissibility of prior sexual conduct will be overturned on appeal only if appellant can show an abuse of discretion." (*People v. Chandler* (1997) 56 Cal.App.4th 703, 711.)

was "assuredly harmless"; "trial court did ultimately conduct a hearing as to those injuries after defendant filed a motion for new trial," and "evidence at the posttrial hearing rebutted the defense theory of relevance"].)

Finally, Benitez argues the 2010 incident bears on Wendy's credibility because Wendy may have fabricated allegations against Benitez in this case in retaliation for stricter rules in the house after the incident with Giovanni. The trial court properly denied an evidentiary hearing on this speculative theory. (*Mestas, supra,* 217 Cal.App.4th at p. 1518 ["The purpose of an Evidence Code section 782 hearing is to establish the truth and probative value of the offer of proof, not to allow a fishing expedition based on sketchy and unconfirmed allegations."].) In any event, Benitez suffered no prejudice because his counsel was able to elicit testimony at trial bearing on this theory without referencing the 2010 incident. Wendy *rebutted* the theory by testifying she had no curfew and was not required to check in when she was away from home.

In short, evidence regarding Wendy's sexual contact with Giovanni in 2010 was inadmissible under Evidence Code section 352. Therefore, Benitez does not meet his burden to show prejudice as a result of his attorney's failure to advance every possible relevance theory or file a motion under Evidence Code section 782. There is no "reasonable probability" the result would have been different but for his counsel's alleged shortcomings (*Williams*, *supra*, 16 Cal.4th at pp. 214-215), and his ineffective assistance of counsel argument is without merit.

20

DISPOSITION

The judgment is affirmed.


                                                                    McDONALD, J.

WE CONCUR:


NARES, Acting P. J.


McINTYRE, J.